```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK


ANGELICA PARKER,                    : Docket #24-cv-00245

                  Plaintiff,    :

     -against-                      :

SCOTT BURSOR, et al.,               : New York, New York
                                      August 5, 2024
                  Defendants.

--------------------------------:

                    PROCEEDINGS BEFORE
            THE HONORABLE ROBYN F. TARNOFSKY
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:       WIGDOR, LLP
                     BY:  MICHAEL J. WILLEMIN, ESQ.
                          JEANNE-MARIE CHRISTENSEN, ESQ.
                          BROOKE PAGE, ESQ.
                     85 Fifth Avenue, 5th Floor
                     New York, New York 10003


For Defendant:       GIBBONS, PC
                     BY:  CHRISTINE AMALFE, ESQ.
                          CHARLES KORSCHUN, ESQ.
                     One Gateway Center
                     Newark, New Jersey 07102


For Defendant:       GREENBERG TRAURIG, LLP
                     BY:  PAUL H. SCHAFHAUSER, ESQ.
                          CLARISSA GOMEZ, ESQ.
                     500 Campus Drive, Suite 400
                     Florham Park, New Jersey 07932



Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>E X H I B I T S</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

1          THE DEPUTY CLERK:  Good morning, everyone.

2     Today we have Judge Robyn Tarnofsky presiding over

3     24-cv-245; Parker v. Bursor.

4          Please state your appearance for the

5     record, plaintiffs first.

6          MR. WILLEMIN:  Good morning, Your Honor.

7     This is Michael Willemin with Wigdor LLP for the

8     plaintiff.  And my partner, Jeanne Christensen, is

9     on, as well as an associate, Brooke Paige.

10          MS. AMALFE:  Good morning, Your Honor.

11     Christine Amalfe and Charles Korschun for the

12     defendants, from the law firm of Gibbons P.C.

13          MR. SCHAFHAUSER:  Good morning, Your Honor.

14     Paul Schafhauser of Greenberg Traurig, for the

15     movant, Ivan Wilzig.

16          MS. GOMEZ:  Good morning.  Clarissa Gomez

17     is also here from Greenberg Traurig on behalf of

18     movant.

19          THE COURT:  Good morning, everyone.  Thank

20     you for being here.

21          Mr. Schafhauser, it's your motion.

22          MR. SCHAFHAUSER:  Thank you, Your Honor.  I

23     appreciate the opportunity.

24          Your Honor, I'm sure, has read the papers.

25     This motion is brought by a nonparty who was served

1  with a subpoena with 46 different requests.  And not

2  only was it 46 separate requests, Your Honor, but

3  the subpoena seeks discovery as to, I believe it's

4  18 -- we put it in our papers -- 18 nonparties.  So

5  it's a subpoena served on a nonparty seeking

6  discovery as to other nonparties.  And it also seeks

7  litigation-related discovery as to several matters,

8  at least three of them, specifically, referenced

9  that the parties here -- Mr. Bursor, is not a party

10  to.

11          So it seeks discovery as to litigation to

12  which Mr. Bursor is not a party.  It seeks discovery

13  as to individuals that are not parties here, and

14  then it seeks discovery from a nonparty as to

15  communications relating to the plaintiff.  But the

16  subpoena itself indicates, because they actually

17  quote -- these requests quote certain documents

18  which the defendants apparently obtained from the

19  plaintiff.  So they have the documents in question,

20  as the subpoena itself indicates.

21          So number one, as to the discovery relating

22  to the plaintiff, the defendants either already have

23  that documentation, or they can get that

24  documentation.  There's been some competing

25  references, Your Honor, in the papers submitted as

1    to whether the plaintiff is in default of its

2    discovery obligations.  I saw plaintiff's counsel

3    put in a letter, I think, contesting that.  But the

4    defendants assert that plaintiff has not yet fully

5    provided its documentation and its discovery

6    responses.

7            Well, regardless of what the details are --

8    and, you know, I'm not privy to them, but regardless

9    of what the details are, it seems that the

10   appropriate remedy for the defendants would be to

11   avail themselves of their right to compel production

12   by the plaintiff in this case as to any documents

13   that might be irrelevant, and not to burden a

14   nonparty with requests as to documents that are

15   readily available from a different means, namely,

16   the plaintiff who brought this case.

17           So we would submit, Your Honor -- Your

18   Honor, we would submit, in the first instance, that

19   the information -- if there is relevant information

20   as to the plaintiff and the defendant, that

21   information either already is in defendant's

22   possession or could be in defendant's possession if

23   they simply avail themselves of their rights and

24   remedies under the discovery rules.

25           Your Honor is obviously well aware of the

1   principle that a Rule 35 subpoena is not intended to

2   supplant or circumvent a party's discovery

3   mechanisms under Rules 26 and 34.  If defendant is

4   entitled to discovery, it should do so from the

5   plaintiff.

6           So point one, I would submit, Your Honor,

7   respectfully, is that defendants can and should

8   obtain the requested information through a less

9   burdensome and oppressive means, namely, from the

10  plaintiff in this case.

11          THE COURT:  Okay, why don't we stop on that

12  point.  If you have more to say on that point, I'm

13  happy to hear it.  But if you don't, then I'd like

14  to hear what defendant's counsel has to say on that.

15          MR. SCHAFHAUSER:  Very well.  I do have

16  other points, but I'll stop as Your Honor requested.

17  I have other points to make, but not on that.  That

18  point is basically the point that I've just

19  articulated.

20          THE COURT:  Okay, then, Ms. Amalfe or Mr.

21  Korschun?

22          MS. AMALFE:  Thank you -- thank you, Your

23  Honor.  Christine Amalfe.

24          Your Honor, I understand you want me to

25  focus, first, on our ability to get the documents

1    from the plaintiff; is that correct?

2           THE COURT: Yes, please.

3           MS. AMALFE: Okay, so counsel keeps arguing

4    that the request to the plaintiff are repeats of the

5    request to Mr. Wilzig. That's not true. There are

6    a whole lot of people who may have commented on the

7    issues between plaintiff and Mr. Bursor. There are

8    a whole lot of people who would have been involved,

9    and we believe were involved in discussions about

10    the plaintiff's tendency, and her basically acting

11    as an extortionist over a period of many years. The

12    communications between them, whether the plaintiff

13    is involved in them or not, would be relevant to

14    discussing the extortion efforts here.

15           We submitted the declaration of Mr. Bursor,

16    as you know, which set out in great detail why he

17    believes, and the facts supporting his belief that

18    this plaintiff has had a history of extorting rich

19    or men of means, after engaging in sexual behavior

20    with them. And we believe that Mr. Wilzig was

21    intimately involved in that.

22           I will give you an example, Your Honor. If

23    we were to just search for Mr. Bursor's name in Mr.

24    Wilzig's emails or his text messages, the text

25    message, which we highlighted, which Mr. Bursor has

1    a copy of, has a photograph of where Mr. Wilzig says

2    to the plaintiff -- the plaintiff says, "I'm going

3    to send a back bill to someone I had sex with."  And

4    Mr. Wilzig says, "Or that person will become the

5    next De La Hoya."  That wouldn't come up.  We would

6    never have gotten that text.

7         THE COURT:  Right, but you could get that

8    from the plaintiff, right?

9         MS. AMALFE:  I could get it from the

10   plaintiff, Your Honor, but there are many I can't

11   get from the plaintiff.  The plaintiff has not

12   responded to our document request.  They are too --

13        MR. WILLEMIN:  The responses are due today.

14   The responses are due today.  I'm -- your Honor, I

15   so apologize because I know I'm interrupting, but --

16        THE COURT:  I really -- yeah, I don't -- I

17   don't appreciate the interruption, but I do, you

18   know, want to understand, even if they're overdue,

19   why is your recourse going to a third party?

20        MS. AMALFE:  Your Honor, this plaintiff has

21   lied.  This plaintiff has produced documents in

22   response to the Rule 26 disclosures.  And we know --

23   we already know that documents are missing.  We

24   already know that text messages have been deleted or

25   are not being produced.  We could provide Your Honor

1   with a list of all of those.  We know that she's not

2   giving us everything.  We know that things are

3   missing.  The law makes clear, the cases make clear

4   that we can test the plaintiff's production by

5   seeking documents from third parties.

6           THE COURT:  You can test it, but not

7   necessarily going back over the length of time that

8   you're going back, for the breadth that you're going

9   back.  I agree 100 percent.  Once she's produced,

10  which it doesn't sound like she has yet, which makes

11  me think this is premature, but once she's produced,

12  you can test sampling, but I'm not sure why you can

13  do that now.

14          MS. AMALFE:  Well, Your Honor, we have a

15  November -- I think it's a November 1st discovery

16  cutoff.  We are now -- the plaintiff pushed to have

17  a November 1st discovery cutoff.  I do not believe

18  the plaintiff's responses to documents were due

19  today.  I believe they were due two weeks ago.  But

20  Mr. Willemin will have whatever position he has on

21  that.  We served interrogatories; we got objections

22  to half of them; we didn't get responses.

23          There's going to be motion practice with

24  regard to the interrogatories, with regard to the

25  document request.  I'm very concerned that if I wait

1  to do third-party discovery until I get what I'm
2  supposed to get from plaintiff, that I'm going to be
3  jammed up at the end and not be able to complete the
4  depositions that need to be completed.

5          With that said, what we asked Mr. Willemin
6  to do -- I mean, Mr. Wigdor -- I'm sorry, what we
7  asked Mr. Wilzig to do -- there's too many W's in
8  this case.  What we asked Mr. Wilzig's counsel to do
9  was to give us a response to each of the document
10  requests, to say, do you have documents or don't you
11  have documents?  And do you have a lot of documents,
12  or do you have no documents?  We just wanted to meet
13  and confer with regard to every single document
14  request.  We were never given that opportunity.

15          They didn't want to respond and object or
16  assert objections, or tell us that there were
17  documents, or there were no documents.  He could
18  easily say, "I didn't even know this woman before
19  2011."  Okay, if that's the case, then we're not
20  going to ask questions between the period of time
21  2007 to 2011.  We know that she's engaged in
22  extortion before now.  We know that Mr. Wilzig was
23  involved in that.  And so there may be documents
24  between Mr. Wilzig and others.  If there aren't, he
25  could say there are no documents.

1          THE COURT:  I don't know that he's required

2     to do the search.  Well, I guess that's a different

3     category, first of all, and what we're talking about

4     now are documents that you could get with the

5     plaintiff, so communications between your -- between

6     Mr. Wilzig and the plaintiff.  And as to those, I'm

7     having a hard time understanding why now is the

8     right time.

9          MS. AMALFE:  Your Honor, if the Court wants

10    us to wait for the plaintiff to produce all the text

11    messages between she and Mr. Wilzig, we could do

12    that and then renew our subpoena for what we believe

13    to be missing.  And we already --

14         THE COURT:  I think that would be the

15    appropriate course of action with regard to those

16    communications.  Yes.

17         MS. AMALFE:  And we would ask, however,

18    that the plaintiff not delay in providing those

19    documents to us because I'm worried about the back

20    end of the discovery cutoff.  You know, if plaintiff

21    is going to send me responses today, that's nice,

22    he's going to send me responses.  When am I going to

23    get the actual text messages and emails between the

24    plaintiff and Mr. Wilzig?  Because I have to be able

25    to test that, and I need enough time to do that.

1                So if Your Honor is suggesting I wait, I'm
2    fine with that.  I just need to understand when the
3    plaintiff is going to get me those documents.
4                THE COURT:  So, Mr. Willemin?
5                MR. WILLEMIN:  Yes, Your Honor.
6                So a couple of things.
7                THE COURT:  Well, I'd like an answer to the
8    question that was posed first, and that is:  When do
9    you expect to be able to start and complete a
10   rolling production of text messages between your
11   client and the movant?
12               MR. WILLEMIN:  Next week.  However, Your
13   Honor, my client --
14               THE COURT:  Start or finish?  I asked you
15   two things.
16               MR. WILLEMIN:  Start and finish.
17               THE COURT:  Starting and finishing all next
18   week?
19               MR. WILLEMIN:  No, I can start with next
20   week producing the documents.  I don't think that it
21   would take me more than two weeks to complete the
22   production of relevant messages.
23               And this is the -- the point:  The
24   defendant is not entitled to every single
25   communication that our client has ever had with Mr.

1    Wilzig.  And the accusations that are being made on
2    this call are outrageous and completely disconnected
3    from reality.  And so the whole premise that the
4    defendant needs any of my client's text messages
5    with Mr. Wilzig is based on a complete fabrication.
6            And so I would say that, to the extent that
7    there are relevant messages between my client and
8    Mr. Wilzig about Mr. Bursor, I can produce those in
9    the next two weeks.  But this entire subpoena and
10   this entire effort to get messages -- and I'm
11   just -- I would like Your Honor's -- quoting from a
12   text message -- or, excuse me, quoting from a
13   conversation that Mr. Bursor had with my client, he
14   said, "Do you think that Ivan isn't going to have my
15   fist up his ass all the way to my fucking elbow?  It
16   doesn't matter what he has to do with anything.  I
17   will fucking victimize him to get back at you.  I'm
18   going to hit everybody that has any connection to
19   you so fucking hard, they aren't going to know what
20   the fuck happened.  And I hope you are recording
21   this."
22           Ivan Wilzig, and then another -- four other
23   people, one of who has also been subpoenaed in this
24   case, "I'm going to grab every fucking one of them
25   by the back of their fucking heads and rub their

1    fucking noses in it, in court, in the press, right

2    in your fucking face, for a fucking decade."

3         That is what is motivating this entire

4    subpoena process, and the communications that are

5    being sought, not just with my client, but with

6    others.  I mean, he's asking for communications from

7    Mr. Wilzig, with third parties, every single

8    communication they ever had, without regard to

9    relevance or topic or category or anything.

10         THE COURT:  So I don't know that you have

11   standing to object to the scope of the subpoena

12   as -- right?  That is something for Mr. Wilzig's

13   counsel to do, and I'm sure that it will be done

14   quite ably.

15         MR. WILLEMIN:  Understood.  I just wanted

16   to provide Your Honor with the context behind this,

17   because these are -- Mr. Bursor -- and we put it in

18   the complaint, but not, obviously, as detailed as

19   what I've just described.  And this is just one

20   conversation of many.

21         My client has standing, at least with

22   respect to the fact that she cannot be subjected to

23   harassing, retaliatory litigation tactics.  This

24   is -- what I just quoted Mr. Bursor as having said

25   is from a recording.  He is a lawyer who is barred

1    in the State of New York, who is threatening,

2    regardless of whether or not these individuals have

3    anything to do with this case, to drag them into it,

4    to get -- literally, "I will fucking victimize him

5    to get back at you."

6          So my client certainly, I think has -- and

7    I'm not -- I understand that, you know, I'm not

8    here.  I didn't make a motion to quash the subpoena,

9    but at the end of the day, what we're hearing is we

10   have a complaint in this case that is under seal

11   right now.  Still under seal, which I understand

12   why, procedurally, that's fine, and Judge Clark will

13   end up dealing with that.

14         But at the same time as we have a complaint

15   that's under seal with the allegations in this case

16   that are the -- that are not known to anyone in the

17   world, including Mr. Wilzig, I don't think, we now

18   have Mr. Bursor setting subpoenas that, based on the

19   very questions that are being asked, are indicative

20   of his defenses, and Mr. Bursor's counsel getting on

21   this call, calling my client an extortionate -- an

22   extortionist half a dozen times.  And so Mr.

23   Bursor's defense is public through these subpoenas.

24   And he told my client why he was going to send

25   these, to victimize these people, so I just wanted

1    to make sure that the Court has the understanding.

2              And in terms of the document responses,

3    just to be very clear, our responses are due today.

4    The scheduling order provided for 45 days to respond

5    to the document requests.  That is today, based on

6    when the requests were served.  And so the responses

7    will go out today.  The interrogatory responses that

8    were referenced have already gone out.  The reason

9    we objected, there were about 100 interrogatories

10   asked of us.  When you -- the first interrogatory

11   itself had about 30 different subparts.

12             So this is a total abuse of the discovery

13   process the defendants are engaging in at this

14   point.  And it's not surprising because Mr. Bursor

15   said what he was going to do when he gets involved

16   in this litigation.  And that's what we're seeing

17   here, Your Honor.

18             THE COURT:  Okay, so if I understand

19   just -- well, I just want to confirm that you are

20   going to complete production of text messages

21   between your client and Mr. Wilzig within two weeks.

22             MR. WILLEMIN:  The non-objectionable ones,

23   yes.  I'm not agreeing to produce every

24   communication the two of them had.  It's not --

25   they're not relevant.  We're going to object to the

document requests, and we'll produce the materials
that are relevant and discoverable.

And with that, with respect to the
communications involving Mr. Wilzig, I can do that
in the next two weeks. I don't know if there are
going to be any. But to the extent that there are
non-objectionable communications or actual,
discoverable communications between my client and
Mr. Wilzig, then I will produce those.

THE COURT: Well, look, I certainly
encourage you. I certainly encourage you to make
your objections, to meet and confer. And if there's
a disagreement about what the scope of the
production is, you should come back promptly, and we
can get that sorted out.

MS. AMALFE: Your Honor, may I just address
one thing?

THE COURT: Yeah?

MS. AMALFE: I think Mr. Willemin is
missing the point that it is Ms. Parker who put Mr.
Wilzig in the middle of this case by identifying him
as someone who's familiar with the allegations of
the complaint, and the damages in this case.

In addition, my client has submitted a
declaration under oath explaining Mr. Wilzig's role,

1    and how he is very important to the defense of this

2    case.  The plaintiff doesn't get to pick and choose

3    which text messages are, quote, relevant.  I can't

4    argue.  I don't know what's in the text messages.

5    If I can't get them from Mr. Wilzig, and I need to

6    get them from the plaintiff, and the plaintiff is

7    suggesting there may not even be any, which is

8    shocking, because we know there are relevant text

9    messages because Mr. Bursor took some pictures of

10   them.  And we've submitted them to Your Honor.

11        Mr. Bursor has provided a detailed

12   declaration about the facts that clearly indicate

13   how Mr. Wilzig is involved in this case.  She lived

14   with him.  She had a sexual relationship with him.

15   She worked with him on her -- on her De La Hoya

16   case, where she was sanctioned for lying.  She's

17   text messaged with him about getting payment from

18   other -- other men that she's had sex with.  He's

19   central to this case.

20        They don't get to pick and choose.  We're

21   entitled to all the text messages.  And there's no

22   certification from Mr. Wilzig.  There's no

23   certification or declaration from the plaintiff

24   saying, oh, he had nothing to do with it.  Why is

25   that certification or declaration missing?  It's

1    missing because they know that Mr. Wilzig was
2    central to her scheme to extort people, including my
3    client.  They're fighting this subpoena, and they're
4    fighting the production of documents because these
5    documents are not going to be helpful to the
6    plaintiff's case.  In fact, they're going to prove
7    our defense.
8           And so the law is, if there is a chance
9    that this discovery is going to lead to admissible
10   evidence, if there's any possibility that this
11   discovery is relevant to a cause of action or a
12   defense -- and this is our defense; we've laid it
13   out -- we're entitled to that discovery.  And this
14   is exactly why we went to Mr. Wilzig, because we
15   know plaintiff is not going to give us the
16   documents.  We know that.
17          THE COURT:  Okay, but, you know, look, I
18   understand what your position is, and maybe you're
19   right, and maybe you're wrong, but you have an
20   obligation to go to the plaintiff first and to go
21   through that process.  And that process may include
22   coming back to me if you can't agree on the scope of
23   production.  And once that process is complete,
24   that's when you get to go to the third parties on
25   information that the plaintiff could otherwise

1    provide, if you believe that they have not.

2            So I'm not disagreeing with what you're

3    saying in the abstract.  It's just too soon, and you

4    don't know that it's ever going to come to pass.

5            MS. AMALFE:  Your Honor, as I indicated at

6    the beginning, I am fine.  But I would ask that all

7    text messages between the two of them, be produced.

8    They could be produced under a stipulated

9    confidentiality order, which we have in this case,

10   because there's no way that search terms are going

11   to come up with the documents we need.  It's not

12   like they refer to my client by his name in every

13   text message.  We know they don't.  We know that,

14   you know, there's a text message where she's talking

15   about being on the unethical train as she's trying

16   to extort Mr. Strizzullo.  That's not coming up.

17   It's not coming up, and they're not going to view

18   that as, quote, relevant.  And how will I ever know

19   it exists?

20           And if there has to be another motion on

21   this, I can make another motion on this.  But I

22   think we could short circuit that by just requiring

23   the plaintiff, in the first instance, to produce all

24   the messages she has with Mr. Wilzig.  And then I

25   could test that, and I could go back to Mr. Wilzig

1   with a more narrow subpoena.  I could do that.  But

2   there are documents that we want from Mr. Wilzig,

3   separate and apart from the documents and the text

4   messages between Mr. Wilzig and the plaintiff.

5           THE COURT:  No, look, I understand.  You'd

6   have a much better argument on those additional

7   documents, though, if you hadn't included this piece

8   of it.

9           Look, what I'm going to say with regard to

10  text messages between the plaintiff and Mr. Wilzig

11  is, I am inclined to agree that, given the nature of

12  the allegations in the complaint and Ms. Parker's

13  identification as Mr. Wilzig in the initial

14  disclosures of someone with knowledge, that a broad

15  production of the communications between the two of

16  them is appropriate.

17          But we have a process, and the process

18  involves your meeting and conferring.  You know, I

19  don't want to be pedantic about it, but it would be

20  better if you could reach an agreement.  And so,

21  knowing that my view is that there should be broad

22  production, I'm going to tell you to go back and

23  meet and confer about it.  And if you have to come

24  back with another motion, you'll come back with

25  another motion, and I will rule on it promptly, and

1  I will expect prompt compliance with my orders in
2  response.
3          But for now, I'm going to stick with the
4  process.  So you've -- you've heard my view on -- on
5  the discovery with regard to Ms. Parker's
6  obligations, and with regard to Mr. Wilzig's
7  obligations as to communications between him and Ms.
8  Parker.
9          Mr. Schafhauser, what other categories are
10 there that you want to discuss?
11         MR. SCHAFHAUSER:  Well, Your Honor, quite
12 honestly is -- and I've been -- I've been quiet
13 because, A, I didn't want to interrupt anyone, and
14 certainly not the Court; but, B, the exchange that
15 just occurred exemplifies exactly the wisdom of Your
16 Honor's directive that plaintiff, first, be required
17 to go through the process with the defendant,
18 because, obviously, there are issues as to scope and
19 relevance in the first instance between the parties,
20 let alone between a party and a nonparty.
21         But, Your Honor, to answer your question,
22 the subpoena, it's not clear to me what else remains
23 with respect to the requests, other than to point
24 out this:  The subpoena says that it encompasses --
25 here it is, on Page 5 of the subpoena, Paragraph H:

1    "Unless otherwise stated, the applicable time period

2    for each request shall be May 1, 2007 through the

3    present."  I don't have the sealed copy of the

4    complaint, but reading from what has been unsealed,

5    it appears that the allegations in this case relate

6    to events that occurred in or about July 2020.  Why

7    it is that the defendant needs to go back to 2007

8    regarding a matter that apparently occurred in July

9    2020 is beyond me.  That's number one.

10            Number two, Mr. Bursor, I think, in his own

11   declaration, concedes that he first met Ms. Parker

12   years later.  I believe it was 2018 that he alleges

13   he began a relationship with Ms. Parker, so 11 years

14   after the date set forth in the subpoena.  Again,

15   why it is that he needs to go back to 2007?

16            Then you have the fact that there are

17   requests for banker -- here's one, Number 17:

18   "Documents, including text messages, bank or payment

19   records, or other communications with plaintiff."

20   Which, again, by the way, plaintiff should have it,

21   but with plaintiff concerning -- and then you have

22   one, two, three, four, five, six, seven, eight,

23   nine, ten, 11, 12 -- 13 different people listed

24   there, none of whom were -- none of whom were

25   parties to the case.  None of whom are known to us

1    to have been involved in the actions that allegedly

2    occurred in July 2020.

3              So I had mentioned earlier, Your Honor,

4    that my first point was the one that we had

5    addressed.

6              The second point is that the subpoena is

7    grossly overbroad, seeks documents far beyond any

8    conceivable bounds of relevance.  And the subpoena

9    is unduly burdensome, especially when we're talking

10   about a nonparty and a request directed to a

11   nonparty.  It goes back 17 years.

12             Oh, one other thing I should mention in

13   that regard, Ms. Amalfe mentioned a meet and confer.

14   I don't believe Ms. Amalfe was on either of the two

15   meet and confers that actually did occur.  And

16   during those meet and confers, I pointed out that I

17   had spoken with Mr. Wilzig, who -- he doesn't even

18   have a cell phone going back to 2007.  And I'd be

19   curious, who on this telephone call actually does

20   have a cell phone that goes back to 2007.  It would

21   be difficult, if not impossible, for someone to even

22   recreate if -- recreate what text messages somebody

23   had back in 2007.

24             THE COURT:  Well, look, if you don't have

25   the documents, you can't produce them, right?  I

1   mean, so --

2          MR. SCHAFHAUSER:  But it's an incredible

3   burden, Your Honor.  My point is:  It's an

4   incredible burden to ask a nonparty to a case to go

5   back almost two decades to search for other text

6   messages and documents involving other nonparties.

7   You know, so we're doing nonparty discovery as to

8   other nonparties, which is an incredible burden.

9          But again, if you go through the subpoena,

10  all of these, reportedly, are documents that relate

11  to plaintiff.  So if, in fact, they relate to the

12  plaintiff, then they would fall within the category

13  that Your Honor just addressed.

14         THE COURT:  Well, no, no.  If they relate

15  to her, that doesn't necessarily mean that she's on

16  them, right?  Something can be about someone and not

17  to someone.

18         MR. SCHAFHAUSER:  Well, however, if they

19  are -- if they are text messages -- if they are text

20  messages between Mr. Wilzig and 18 different

21  nonparties, or 13 different in respect to Request

22  Number 17 for instance, it's grossly overbroad.

23  It's an undue burden.  It hasn't been demonstrated

24  whatsoever as to why the defendant needs this.

25         And I do need to point out, yes, Mr. Wilzig

1   is a nonparty; yes, we're not a defendant here.  But

2   I do need to point out what Mr. Willemin touched on

3   earlier, which is that my client disputes -- and I

4   don't want my silence to be deemed as some kind of

5   concession, as Ms. Amalfe suggested -- that he

6   allegedly conspired with the plaintiff in this case

7   about anything to shake down people, anything of the

8   kind.

9           But -- but again, we're way beyond that.

10  This is -- this is a document subpoena.  This is not

11  even a deposition subpoena.  This is a document

12  where 46 separate requests are being directed to a

13  nonparty, Your Honor.  And we've cited the cases in

14  our papers where the vast majority of the requests

15  are improper or premature, or overbroad or

16  cumulative.

17          Courts don't modify subpoenas.  Courts

18  quash the subpoenas.  They don't do the work for the

19  subpoenaing party to parse and pick and choose which

20  of the many requests might actually be irrelevant.

21  Court sends the subpoena issuer back to go and

22  directs that issuer to narrowly tailor a proper

23  subpoena and not rest on a grossly improper

24  subpoena.  And I believe, Your Honor, that would be

25  the appropriate result here as well.

1          The defendants issued a subpoena that -- I
2    think we had an admission here from Ms. Amalfe that
3    many -- at least many of the documents are documents
4    that were requested of the plaintiff.  And the
5    plaintiff may well respond, as we just heard, within
6    the next couple weeks.

7          That said, the subpoena should therefore be
8    withdrawn.  And only -- I respectfully submit, only
9    after that process is complete, should the
10   defendants, if there is some kind of discrepancy,
11   which they haven't shown there's a discrepancy in
12   the production, but if there is a discrepancy, then
13   you know, they have their rights and remedies, and
14   you know, we have our rights and remedies as well.

15         But at this moment, Your Honor, the Court
16   is faced with a subpoena that is grossly overbroad,
17   both in terms of scope, in terms of duration, 17
18   years, in terms of the number of nonparties, in
19   terms of the type of documents.  It's a blunderbuss
20   request, or a set of requests that should be
21   quashed.

22              THE COURT:  Ms. Amalfe?

23              MS. AMALFE:  Thank you, Your Honor.

24         First, on the one hand, Mr. Wilzig says the
25   requests are not relevant; on the other hand, he

1    says he has no idea what the allegations and

2    defenses are in this case.  He can't have it both

3    ways.  On the one hand, he says the requests are

4    burdensome; on the other hand, he hasn't come to the

5    court and said why they're burdensome.  He's saying

6    my client disputes he was conspiring with the

7    plaintiff.  Well, then he should have nothing in

8    response to almost all of these requests.  He should

9    have nothing.  It should be very simple.  It can't

10   be burdensome.  If he has a lot of documents, Your

11   Honor, then he was involved in the very issues that

12   are set out in Mr. Bursor's declaration.

13           Mr. Wilzig's involvement here is

14   exceptional.  The plaintiff identified him.  She

15   says he knows about her allegations, he knows about

16   her damages.  She lived with him during the relevant

17   time period.  He was involved in things that

18   predated 2020.  I know counsel for Mr. Wilzig would

19   like to say that this case is all about 2020.

20   That's not our defense.  Our defense goes back to

21   2011 when she sued Oscar De La Hoya and was

22   sanctioned for it for making up a story about Oscar

23   De la Hoya and trying to extort money from him.  We

24   know of at least five men that she is alleging have

25   sexually assaulted her.  They all happen to be

wealthy men who she had sex with.  We know of five.
How many more are there?

     Mr. Wilzig has information about all that
because she described him as her best friend,
someone she lived with, someone on her team.  So Mr.
Wilzig's counsel wants to make it sound like we're
not entitled to go back.  We are entitled to go back
before 2020.

     I'm sorry, Your Honor?

     THE COURT:  I didn't say anything.

     MS. AMALFE:  Oh, I'm sorry.  I heard
something.

     With regard to the argument that I've
somehow admitted that all of these requests were in
the possession of plaintiff, I would say that of the
40 requests, which are very specific -- they're very
specific requests -- of those, maybe two are in the
possession of the plaintiff.  The rest are in the
possession of Mr. Wilzig.  Why, for example, Mr. --
counsel for Mr. Wilzig said, why are we asked for
bank or payment records?  Ms. Parker says that "Ivan
owes me a lot now."  Why does he owe her a lot?  He
is her -- he's a witness she's going to call.
Aren't I entitled to understand why he owes her a
lot, and why that may infect his testimony in this

1    case?

2             And we're not just going after Mr. Wilzig

3    because he's somehow her friend.  He's her best

4    friend.  She lived with him.  She texted with him

5    constantly.  She received some financial support

6    from him.  She received gifts from him.  She engaged

7    in sexual relationships with him.  She worked with

8    him in order to get money to live the lifestyle that

9    she wanted to live.  We're entitled to know his

10   involvement.

11            And all these other people are, by the way,

12   for the most part, also mentioned on the plaintiff's

13   Rule 26 disclosures.  She identifies all of these

14   people as people who have knowledge of her

15   allegations.  We're entitled to know if Mr. Wilzig

16   was communicating with those people, and what he was

17   communicating with those people about this case and

18   about my client and about Ms. Parker.  If Mr. Wilzig

19   is communicating -- I'll use Mr. Leader as an

20   example -- with Mr. Leader about a business

21   transaction that has nothing to do with my client, I

22   have no interest in that document.  But that's not

23   what we're asking for.

24            We're asking for arrangements where Mr.

25   Wilzig was provided -- was having the plaintiff

provide sexual services to people.  We're asking for
documents where they're talking about extorting
people, or getting money from people, or threatening
people.  That's what we're asking for.  We're asking
for documents about why Mr. Wilzig is sending her
money and for what purpose.  So we're asking for
documents about communications that, among others,
where they were talking about drugging Mr. Bursor,
drugging him so that they could go out and have a
sex party without him.  And Ms. Parker could have a
sex party.

I'm not coming out of the blue with these
things, Your Honor.  We have text messages that
suggest that every single thing I just said is in
this case, and it's relevant to our defense.  So you
can't claim -- if Mr. Wilzig doesn't have a cell
phone or text messages go back to 2007, he could say
that, "I don't have them."  That doesn't make it
burdensome.  If you have text messages going back to
2007, great; if you don't, you say you don't.

I will note, Your Honor, that Mr. Wilzig
did receive a document preservation notice back in,
I think, December.  And so he should at least have
communications from December on.  I suspect he has
communications long before December.  But certainly,

1    Mr. -- counsel for Mr. Wilzig wants to argue that

2    Mr. Wilzig has nothing to do with this case.  He is

3    central to this case.  And it's not just the

4    allegations and the complaint.  It's our defense to

5    the complaint where he is central.  And we're

6    entitled to inquire about those things.

7            And Ms. Parker would not have information

8    about his communications with others about Ms.

9    Parker's extorting, Ms. Parker's threatening, my

10   client, Mr. Strizzulo, Mr. Hampman, all of whom --

11   Mr. Carvajal, all of whom are very detailed in

12   explaining.  She engages with him about Mr. Guess

13   and others, Mr. Loeb, about she's going to send them

14   a back bill.  And if they don't pay the back bill,

15   then they'll be the next De La Hoya.

16           Why am I not entitled to text messages if

17   Mr. Wilzig is talking to them, "You better pay her,

18   or you're going to be the next De La Hoya."  Why am

19   I not entitled to those?  Maybe they don't exist,

20   Your Honor, but I'm entitled to have Mr. Wilzig's

21   counsel look for those documents.  And this

22   shouldn't be that burdensome.  It's -- to his point,

23   he has nothing to do with any of these things.

24           It's easy for counsel to say he disputes

25   that Mr. Wilzig conspired with the plaintiff.  I

1    suspect counsel has not reviewed all the text
2    messages, and I don't see any declaration from Mr.
3    Wilzig on that.  It's easy to say it.  I want him to
4    prove it.  And we know better.  We've seen the text
5    messages, at least a few that my clients took
6    pictures of.  There are more.  We know there are
7    more.  This is not a fishing expedition.  This is
8    looking for the documents that go to the central
9    defense in this case, that this plaintiff is a
10   serial extortionist.  She's doing it to five men
11   now.  She's probably done it to more that we don't
12   know about.  The five we know about were filed
13   cases.  We don't know about the ones that weren't
14   filed.  We suspect there's lots more, and that Mr.
15   Wilzig was in the middle of it.
16          MR. SCHAFHAUSER:  Your Honor, may I briefly
17   respond?
18          MS. AMALFE:  Yeah.
19          MR. SCHAFHAUSER:  First of all, I've
20   learned things during the course of this argument
21   that have been unavailable to us as a nonparty
22   because of the sealing of the pleadings.  For
23   instance, the recorded phone call that Mr. Willemin
24   quoted.  The first I heard of it was today.  The
25   assertions, some of which Ms. Amalfe just made, the

1    first I heard of it was today.

2          I would submit to you, it's fundamentally

3    unfair for my client to have to respond and address

4    relevance issues when the parties themselves are in

5    possession of, you know, pleadings that are

6    unavailable to us.  That's number one.

7          Number two, Ms. Amalfe says, oh, Mr. Wilzig

8    is not just a friend, but the best friend.  Oh,

9    okay, well, guilty as charged, but even if someone

10   is the so-called best friend, that doesn't mean that

11   you get to subpoena him and burden him as -- as we

12   heard from Mr. Willemin a few moments ago, just in

13   some kind of retaliatory manner.  And to burden my

14   client with a blunderbuss subpoena.  That's number

15   two.

16         Number three, the examples that Ms. Amalfe

17   just gave you -- I was writing them down -- some of

18   which, again, underscores the point I made a few

19   moments ago.  She's talking about text messages as

20   to why, allegedly -- and I'm not aware of payments,

21   but allegedly, Mr. Wilzig made payments to Ms.

22   Parker.  Okay, well, that would be text messages

23   between Ms. Parker and Mr. Wilzig, which Ms. Parker

24   has.  And that process hasn't even been completed,

25   as we heard.

1          In terms of the scope, I have not yet heard

2    why these requests should go back to 2007, or to

3    2017, for that matter, if the allegations in this

4    case relate to something that allegedly occurred in

5    2020.

6          Moreover, we'd note, Your Honor, that the

7    subpoena itself is grossly overbroad.  I've already

8    explained why.  And this Court should not be

9    burdened, frankly, with having to parse through a

10   number of requests.  The plaintiff -- I'm sorry, the

11   defendant here, Your Honor, burdened my client with

12   a subpoena that, I'm now hearing, there are

13   documents that the defendant could have, and maybe

14   will, within the next two weeks, get from the

15   plaintiff in this case.

16          The subpoena never should have been served

17   at the time when, apparently, the document

18   production responses from the plaintiff were not yet

19   due, and yet they've been pushing my client, a

20   nonparty, to produce documents.  Never should have

21   happened.  And the Court should not condone the

22   overzealous nature of subpoenaing third parties when

23   document production from a party is still

24   outstanding.  The Court should quash this subpoena

25   in all respects, Your Honor.

1    If there is an issue, the defendant has its

2 rights and remedies.  Nobody's saying that this is

3 for all time and forever, but on this motion, the

4 defendant, Mr. Bursor, cannot possibly, with a

5 straight face, say that this subpoena, as drafted

6 and as written, and as served on my client, was

7 appropriate, because we just heard that many of the

8 documents, if not most of the documents, are within

9 plaintiff's possession, and plaintiff may well

10 produce them within the next two weeks.

11    And if there are appropriate objections as

12 to relevance and scope, plaintiff is the one who

13 should be making those objections in the first

14 instance.  And my client shouldn't be burdened to,

15 quote, defend himself, as Ms. Amalfe suggests, when

16 he's not a defendant.  He's not a defendant.

17    So this subpoena was not appropriately

18 issued, should be quashed.  The defendant, Mr.

19 Bursor, should be made to go back to go, so to

20 speak, and the Court should quash this subpoena and

21 grant fees for the cost of having had to go through

22 this very unfortunate process when we heard today an

23 admission that many of the documents are,

24 apparently, within the scope of the requests that

25 remain outstanding from the plaintiff.

1          MS. AMALFE:  Your Honor?

2          THE COURT:  Yeah?

3          MS. AMALFE:  The Court should not condone a

4    moving party who doesn't follow the local rules or

5    Your Honor's rules.  A premotion conference could

6    have resolved many of these issues.  The moving

7    party is seeking fees when the moving party is

8    clearly someone who's been identified by the

9    plaintiff as having substantial knowledge as to the

10   facts and allegations of the complaint, as well as

11   her damages.

12          In addition, they keep saying I somehow

13   admitted that the plaintiff has all this

14   information.  As I said, Your Honor, several times,

15   almost every request -- there's maybe two or three

16   where the plaintiff would have the information.  The

17   rest of the requests have nothing to do with the

18   communications directly between the plaintiff and

19   Mr. Wilzig.  It's between Mr. Wilzig and others.

20   And to be honest, if Mr. Wilzig has no information,

21   he just needs to say that.  We asked him and invited

22   him several times to please go document by document

23   and tell us, do you have documents responsive?  If

24   they don't have documents going back to 2007, it's

25   easy enough to tell us that.  Why 2007?  Mr.

1    Bursor's declaration explains why 2007.  That was

2    the first case that was filed against Mr. De La

3    Hoya, that was then settled for eight figures and

4    reported in the New York Post that Ms. Parker saw.

5    She discussed that she sought out Mr. Strizzulo, and

6    she brought her own suit against Mr. De La Hoya.

7         We believe, and we know that Mr. Wilzig was

8    involved in that.  So it's not about 2020; it's not

9    about 2022.  It's about the whole story leading up

10   to where we are today, which is Mr. Bursor was her

11   latest target.  And so -- and Mr. Wilzig, for good

12   or for bad, can either prove he had nothing to do

13   with anything, or produce the documents that show he

14   was deeply involved, which is what we believe.

15        THE COURT:  Thank you, counsel.

16        Look, I'm not going to quash the subpoena

17   in its entirety.  Certainly there is no obligation

18   to produce documents at this time that would be in

19   the plaintiff's possession, custody, or control.  As

20   to the other document requests, I think that they're

21   fair game, but I would send you back to meet and

22   confer as to what an appropriate scope of production

23   would be.  Each party to bear its own costs.

24        Thank you, everyone.

25        MS. AMALFE:  Thank you, Your Honor.

1          MR. SCHAFHAUSER:  Thank you.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3        I, Marissa Lewandowski, certify that the

4   foregoing transcript of proceedings in the case of

5   ANGELICA PARKER v. SCOTT BURSOR, et al. , Docket

6   #1:24-cv-00245-JGLC-RFT, was

7   prepared using digital transcription software and is

8   a true and accurate record of the proceedings.

9

10

11   Signature   *Marissa Lewandowski*
                 _____

12                  Marissa Lewandowski

13

14   Date:      August 8, 2024

15

16

17

18

19

20

21

22

23

24

25